HERBERT T. HAYASHI, dba C'EST SI BON, Plaintiff-Appellee, *v.* LIZA CHONG, Defendant-Appellant, and GILBERT KAUHI, aka ZULU, and INTERNATIONAL MARKET PLACE, a Hawaii Corporation, Defendants

NO. 7241

CIVIL NO. 36642

SEPTEMBER 11, 1981

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY HAYASHI, C.J.

This is an appeal by Liza Chong from the circuit court's confirmation of an arbitration award in favor of Herbert T. Hayashi, dba C'est Si Bon (CSB), in the amount of $1,032,022.02 for breach of contract and lost profits.

The issue before the court is whether the arbitrator's finding that a partnership existed between Chong and Gilbert Kauhi, also known as Zulu, thereby creating liability for breach of the contract in Chong, was in excess of his powers within the meaning of HRS § 658-9 (1976) so as to warrant vacating the award granted. We affirm the trial court's confirmation of the arbitration award.

CSB brought this action against Chong, Zulu, and the International Market Place for breach of contract.

CSB is a Las Vegas-type showroom in the Pagoda Hotel. On January 19, 1971, it executed a one-year entertainment contract with Zulu and Chong that was renewable for five years. Chong signed the contract as Executive Producer and Manager. For purposes of this lawsuit, the pertinent provisions contained the following:

> 3. Zulu will furnish four (4) musicians and three (3) dancers in the show. Should there be additional dancers or musicians requested by the General Manager of C'est Si Bon, C'est Si Bon will bear the additional cost, based on union scale, for them.

> 4. C'est Si Bon agrees to pay Zulu's Show $2,222.00 guarantee per week, plus 50% of the cover from February 18 to August 18, 1971. . . .

> 5. C'est Si Bon will pay Zulu's Show every Wednesday of the following week, payable to the special account of Zulu's Show in the trust account of Liza Chong in care of American Security Bank.

> 7. (e) When Zulu is leaving for tours, he will allow two (2) weeks notice to the General Manage of C'est Si Bon. . . .

> 10. Zulu may at any time offer his suggestion to the management of C'est Si Bon concerning his show, services, and personnel. The General Manager of C'est Si Bon will also be allowed to offer his suggestions regarding the above show, both through Liza Chong, Executive Producer and Manager.

As a member of the union composed of performing artists, Zulu was also required to execute a standard form contract of the American Guild of Variety Artists (AGVA) with the place in which he was to perform, and on March 5, 1971, they did so. The January 19, 1971, contract was attached as a rider to the AGVA contract; and the spaces left to fill in the terms, pay, and other conditions of Zulu's performance all referred to the "attached rider." On July 1, 1971,

another agreement was entered into by and between CSB, Chong, and Zulu with reference to the number of shows to be given during a week and the amount of cover charge to be assessed. This agreement was also appended as a rider to the AGVA contract. The standard form AGVA contract contained the following arbitration provision:

16. ARBITRATION. All claims or disputes by either party (including AGVA) as to the application or interpretation of the terms and conditions of this agreement or the breach of any provisions thereof shall be attempted to be adjusted between the parties (including AGVA) and, in the event they are not satisfactorily resolved, they shall be submitted for arbitration to the Board of Mediation and Conciliation, if any, in the state in which the dispute arose, or if none, to the American Arbitration Association under its Rules then appertaining, by AGVA or the Operator Employer. The decision of the arbitrator shall be final and binding on all parties concerned.

On February 18, 1971, CSB executed a separate musician's contract with Don Leong and the members of his band to provide music for the Zulu Show for the period February 18, 1971, to September 14, 1971. Thereafter, there was continuous disagreement between the parties as to which of them was responsible for paying the musicians. Leong testified, however, that he received his weekly paychecks from Chong, drawn on Chong's trust account at American Security Bank. Finally, on September 6, 1971, the conflict was resolved by the execution of another rider to the AGVA contract of March 5, 1971, to clarify the question. The rider provided for the musicians' salaries to be paid directly by C'est Si Bon instead of through Chong, with a corresponding reduction in the amount deposited in Chong's trust account. The rider, signed by Herbert Hayashi, Zulu, and Chong, also contained the following provision:

It is further agreed that any disputes or grievances which may arise out of this engagement will first be referred to the attention of the AGVA office by all parties.

From the record before us, it appears that relations between Chong and Zulu and CSB were quite strained during the course of his engagement there with numerous complaints, charges, and countercharges regarding Zulu's failure to sometimes appear, as he was also filming the Hawaii 5-0 series at the time; his failure to commence and end his shows on time; and CSB's alleged inaccu-

racies in computing the cover charges due Zulu.[1] The musicians' contract expired on September 15, but was renegotiated and extended through November 15, 1971, after which time the musicians performed without a contract. As was required under the January 19, 1971 contract, on January 3, 1972, Chong and Zulu gave CSB two weeks' notice for a 14-week vacation commencing on January 17, 1972, to be completed not later than April 24, 1972. The following week, January 10-17, the musicians refused to perform because, they said, they did not have a contract. Zulu, of course, appeared; but due to the lack of musical backup, was unable to perform. In the meantime, Zulu filed a complaint with AGVA alleging that CSB had breached its contract with him by (1) failing to provide him with a band, (2) harassing, aggravating, and humiliating him during the course of his show, and (3) failing to pay him his fair share of the cover charges.

This litigation began on April 25, 1972, however, when CSB filed its complaint for breach of contract against Zulu, Chong, and the International Market Place, when Zulu failed to appear and perform after his 14-week vacation.

On June 6, 1972, Chong and Zulu filed an answer and counterclaim. One of the points raised in their answer and counterclaim was that the AGVA contract entered on March 5, 1971, called for arbitration of all claims or disputes arising between the parties to the contract. On October 31, 1972, counsel for Chong and Zulu filed a motion to stay proceedings on the ground that HRS Chapter 658 mandates arbitration on the case.[2] The record, however, does not reflect any determination by the court of this motion. On March 2, 1973, counsel for Chong and Zulu filed a motion for partial summary judgment and to stay proceedings on the basis that the AGVA contract and the January 19, 1971, rider were one contract and that the terms of the AGVA contract required arbitration of disputes

---

[1] It is also apparent that during this period of time, Chong had entered into negotiations to take over operation of the Duke Kahanamoku nightclub in the International Market Place in April 1972. In fact, by December 1971, Chong and Zulu had entered into a lease agreement with International Market Place for the operation of the nightclub.

[2] HRS § 658-5 (1976) provides that after action is instituted and the issue of arbitration is raised, the action shall be stayed pending arbitration.

arising thereunder even though Chong was not a named party to the AGVA contract. On March 12, 1973, the court entered an order granting partial summary judgment and staying the proceedings, which stated as follows:

The motions of Defendant GILBERT KAUHI, LIZA CHONG and INTERNATIONAL MARKETPLACE CORPORATION to enter a partial summary judgment of the issue of the applicability of AGVA standard form contract BC 3840 and to stay proceedings herein pending arbitration pursuant to Chapter 658, Hawaii Revised Statutes, having duly come on for hearing before the Court on March 5, 1973, at 9 a.m., the Court having been fully advised in the premises, and the Court being satisfied that there is no genuine issue as to any material facts relating to the applicability of AGVA standard form contract BC 3840 and that the issues herein are properly referable to arbitration in accordance with the terms of AGVA standard form contract BC 3840, which terms are in writing.

IT IS HEREBY ORDERED, that the motion of Defendants for partial summary judgment as to the applicability of AGVA standard form contract BC 3840B and the same hereby is, granted.

IT IS FURTHER ORDERED, that all further proceedings herein, shall be stayed until arbitration has been had in accordance with the terms of the aforesaid AGVA Contract.

On July 3, 1973, CSB made a formal demand for arbitration. However, due to the lack of progress in setting the arbitration hearing, on November 14, 1977, CSB filed a "Motion to Rescind the Stay of Proceedings or in the Alternative to Order Arbitration to Proceed." On December 7, 1977, the court entered an order stating:

IT IS HEREBY ORDERED, ADJUSTED AND DECREED that:

1. The Stay order presently in effect shall remain in effect.

2. That the pre-trial and trial schedule for arbitration set by arbitrator, Gerald Clay, be adhered to, specifically: the deadlines for responsive pleadings, pre-trial motions and the hearing on the merits; which hearing on the merits is set for December 13, 1977.

3. That the preliminary hearings and hearing on the merits shall proceed whether or not the Defendant is represented by counsel prior to or at said hearing.

Nearly five years elapsed from July 3, 1973, the date of formal demand for arbitration made by CSB, before the arbitration hearings finally began on February 2, 1978. Chong changed counsel numerous times on the eve of scheduled hearings, necessitating further delays. Arbitrators were changed often as well — one withdrew because of the parties' lack of diligence and cooperation in scheduling the hearings; another arbitrator was forced to withdraw because objections to his partiality were raised by one of Chong's counsel. After incurring lengthy delays in securing a replacement, Chong's objecting counsel was withdrawn, resulting in even further delay. By the time the hearings were to be set, Zulu had entered into a stipulation with CSB to dismiss him as a defendant, leaving Chong as the sole defendant.[3] Chong then objected to arbitration because, she claimed, she was not a party to the contract and was only acting as Zulu's agent. The trial court ruled that whether Chong was acting on her own or in some other capacity was a matter within the scope of the arbitrator's authority, he having acquired jurisdiction over all the remaining proceedings. Thus, by the time the hearings actually began, the issues to be considered by the arbitrator were as follows:

1. the relationship between Zulu and Chong and whether Chong could be individually liable on the contract,

2. which of the contracts alleged are valid and binding; and if so,

3. whether a material breach of contract was perpetrated by Zulu and respondent Chong; and if so:

4. damages.

The hearings lasted five days, February 2, 7, 8, 9, & 23, 1978; and the arbitrator received testimony, *inter alia,* from Chong, Zulu, Herbert Hayashi, and Donald Leong, the band leader. Based upon the testimony and documentary evidence detailing various communications and transactions between the parties, themselves, musicians' union, and the manager of the International Market Place, the arbitrator

---

[3] International Market Place was also dismissed and was not a party to the arbitration.

concluded that "notwithstanding the language of the purported 'manager agreement' dated January 3, 1968, an actual partnership between Liza Chong and Gilbert Kauhi had existed." The arbitrator went on to conclude:

> [T]he managers [sic] agreement' dated January 3, 1968 had either lapsed or otherwise was not given full force and effect by Respondent. The record is replete with indications that Respondent had taken a pervasive role in the control of all of [Zulu's] performances and financial dealings. This kind of control is highly uncharacteristic of a mere agency relationship as Respondent now asserts.\*\*\* Respondent's conduct went far above that of merely managing [Zulu's] entertainment affairs. Respondent had inextricably intertwined her influence and control over practically all of [Zulu's] financial affairs, and had commingled much of the proceeds from the Zulu Show for use in financing other ambitions. Such acts could not have been rightfully done by a mere agent.

Based upon her conduct as noted above, the arbitrator concluded that Chong was estopped to deny the existence of this "implied partnership," citing 68 C.J.S. *Partnerships* § 172. That Zulu and Chong were engaged in a "joint venture" is a more legally accurate description of their relationship even though the liabilities created remain the same. 46 AM. JUR.2d *Joint Ventures* § 7 (1969); *Baker Farmers Company v. Harter*, 28 Ill. App.3d 393, 328 N.E.2d 369 (1975). *Bank of California v. Connolly*, 36 Cal. App.3d, 111 Cal. Rptr. 468 (1974). The arbitrator went on to conclude that the January 19, 1971, agreement signed by Chong and Zulu and CSB was modified and supplemented by the March 5, 1971 AGVA contract, in effect, creating a single contract; and that Chong, a party to the January 19, 1971, contract, purposefully breached that agreement, having by September 1971 already agreed to open Zulu's Show at Duke Kahanamoku's in mid-April 1972 while a binding contract remained in force with CSB. The arbitrator went on to conclude that CSB was damaged by Chong's breach in the amount of one million thirty-two thousand twenty-two dollars and two cents ($1,032,022.02).

Chong then moved in the circuit court to have the award vacated and/or set aside, arguing unsuccessfully (1) that she was not the proper party for arbitration; and (2) that the arbitrator exceeded the scope of his authority in finding that a partnership relationship

existed between Chong and Zulu. On September 5, 1975, Judge Fong confirmed the arbitration award, denying Chong's claims; and on October 3, 1978, this appeal was taken.

At the outset we note that our review of the confirmation of an arbitration award is limited to allegations of error under HRS §§ 658-9 (1976) and 658-10 (1976).

> § 658-9 *Vacating award.* In any of the following cases, the court may make an order vacating the award, upon the application of any party to the arbitration:
>
> > (1) Where the award was procured by corruption, fraud, or undue means;
> >
> > (2) Where there was evident partiality or corruption in the arbitrators, or any of them;
> >
> > (3) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehavior, by which the rights of any party have been prejudiced;
> >
> > (4) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award, upon the subject matter submitted, was not made.
>
> . . . .
>
> § 658-10 *Modifying or correcting award.* In any of the following cases, the court may make an order modifying or correcting the award, upon the application of any party to the arbitration:
>
> > (1) Where there was an evident miscalculation of figures, or an evident mistake in the description of any person, thing, or property, referred to in the award;
> >
> > (2) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted;
> >
> > (3) Where the award is imperfect in a matter of form, not affecting the merits of the controversy.
>
> . . . .

Our supreme court has recognized that contractual agreements to submit disputes to arbitration have as a primary purpose, the avoidance of litigation. *Mars Construction, Inc. v. Tropical Enterprises, Ltd.,* 51 Haw. 332, 460 P.2d 317 (1969); *Loyalty Development Co., Ltd.*

*v. Wholesale Motors,* 61 Haw. 483, 605 P.2d 925 (1980); *Brennan v. Stewarts' Pharmacies, Ltd.,* 59 Haw. 207, 579 P.2d 673 (1978). Accordingly, in *Mars,* the Supreme Court adopted restrictive judicial review of arbitration awards as its standard.

> We believe that the legislative intent in § 658-9 and § 658-10 was to restrict and curtail all judicial review of arbitration awards and not only review by circuit courts, and we hold that § 658-9 and § 658-10 also restrict the authority of this court to review judgments entered by circuit courts confirming the arbitration awards pursuant to the provisions of the Arbitration and Awards statute.

*Mars* at 336.

Chong argues in this appeal that the arbitrator exceeded his authority under HRS § 658-9 (1976) in (1) finding that a partnership relationship existed as that was not a matter submitted for arbitration, and (2) that she was not a proper party for arbitration. We disagree with her contentions. Our review of the record clearly shows that the issue of the relationships between Zulu and Chong was a matter appropriately submitted to arbitration.

The original motion for arbitration was initiated by Edward Kim, who was then attorney for Chong and Zulu. He argued that the issues raised in the complaint and counterclaim were governed by the arbitration clause in the March 5, 1971, AGVA contract. At that time it was undisputed by Chong and her counsel that she, too, was covered by the provision because of the riders of January 19, 1971, July 1, 1971, and September 6, 1971, appended to the AGVA contract.[4] The order granting arbitration comported with Chong's motion that the AGVA contract arbitration provision governed all issues raised in the claims of the parties.

The AGVA contract form had a place for the signature of the artist's agent which Chong did not sign, although her primary contention throughout these proceedings was that she was only acting as Zulu's agent. When Zulu was dismissed as a party, the issue of liability for breach of the contract necessarily focused on the kind of relationship that existed between him and Chong. Apparently,

---

[4] *See* 17 AM. JUR.2d *Contracts* § 263 (1964).

Chong's assertions that as the agent for Zulu, she could not be held liable as a principal to the contract began at this point.

However, the evidence shows that all of the contractual documents had been executed either directly or by way of a rider by Chong, without clearly delineating her role as agent.

The contract of January 19, 1971, with CSB was signed by Zulu and Chong. Chong signed the contract as Executive Producer and Manager. The rider executed between CSB, Zulu, and Chong to be effective September 6, 1971, with reference to the salary of performers was signed by Chong only as Liza Chong with no title as agent. The rider executed on July 1, 1971, by and between CSB, Zulu, and Chong with reference to the number of dinner shows to be given during a week and cover charge to be assessed was signed by Chong only as Liza Chong with no title as agent. Further, the records show that the allegations contained in Count II of the counterclaim Chong filed in this case imply one of partnership between Chong and Zulu.

Accordingly, based on our review of the record, we cannot conclude that the arbitrator exceeded his authority in determining the relationship between Zulu and Chong. *Mars Construction, Inc. v. Tropical Enterprises, Ltd., supra.* Nor can we find error in the circuit court's determination that the arbitrator's authority had not been exceeded within the meaning of HRS § 658-9 (1976) in its confirmation of the arbitration award.

Accordingly, judgment is affirmed.

*Robert T. Takamatsu (Bert T. Kobayashi, Jr.,* on the brief, *Kobayashi, Watanabe, Sugita & Kawashima,* of counsel) for plaintiff-appellee.

*Dianne L. Y. Lee & Cheryl K. Okuma (W. Patrick O'Connor* on the briefs, *Barlow & O'Connor,* of counsel) for defendant-appellant.